Motion for Rehearing Granted; Affirmed in Part, Reversed and Remanded in
Part, Dismissed in Part, and Majority and Concurring and Dissenting Opinions
filed February 3, 2009








 

Motion
for Rehearing Granted; Affirmed in Part, Reversed and Remanded in Part,
Dismissed in Part, and Majority and Concurring and Dissenting Opinions filed
February 3, 2009.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-05-01090-CV

_______________

 

ENVIRONMENTAL PROCEDURES, INC. and ADVANCED WIRECLOTH,
INC., Appellants

 

V.

 

GEORGE E. GUIDRY, DWIGHT W. ANDRUS, III, DWIGHT W.
ANDRUS INSURANCE, INC., and LEXINGTON INSURANCE CO., Appellees

                                        
                                                                                                       

On Appeal from the 164th District Court

Harris County, Texas

Trial Court Cause No. 03-49520

                                                                                                                                               


 

 M A J O R I T Y   O P I N I O N    O
N    R E H E A R I N G

We grant appellants= motion for rehearing, deny as moot
their motion for rehearing en banc, withdraw our opinions of April 17, 2008,
and substitute this majority opinion on rehearing.








This multi-issue appeal arises from a
dispute between an insurance broker and his clients as a result of the
marketing and sale of several insurance policies.  Appellants Environmental
Procedures, Inc. and Advanced Wirecloth, Inc. (the AInsureds@) contend the trial court erred in
(a) granting partial summary judgment in favor of the insurance broker,
the company that employed him, and the owner of that company on the Insureds= claims arising from the appellees= alleged negligence, negligent
misrepresentation, and violations of former article 21.21 of the Texas
Insurance Code;[1]
(b) directing a verdict on the Insureds= claims for breach of fiduciary duty;
(c) failing to render judgment in the Insured=s favor regarding their claims under
section 101.201 of the Texas Insurance Code; (d) excluding from evidence
two issues of a trade publication; and (e) enjoining the Insureds and
their counsel from further use or disclosure of certain documents obtained
through discovery in another case.  We conclude that the trial court erred in
granting partial summary judgment; thus, we reverse the trial court=s judgment in part and remand the
Insureds= claims of negligence and violations
of article 21.21 of the Texas Insurance Code.  Additionally, we conclude that
the trial court=s non-disclosure order was void ab initio, and thus,
we dismiss as moot the Insureds= appeal from this order.  In all other respects, we affirm
the trial court=s judgment.

                              I. 
Factual and Procedural Background








Appellant Environmental Procedures,
Inc. d/b/a Sweco Oilfield Services (AEPI@) operated as a tool rental and
oilfield service company; its subsidiary, appellant Advanced Wirecloth, Inc. (AWirecloth@), manufactured screens used in the
oil industry.  At the time of the events in question, the respective
headquarters for EPI and Wirecloth (collectively, Athe Insureds@) were located in Texas.  The
Insureds= agent or broker was appellee George
Guidry (AGuidry@), who was employed by appellee
Dwight W. Andrus Insurance, Inc. (the AAgency@) in Louisiana.  Appellee Dwight W.
Andrus, III (AAndrus@) was the owner of the Agency.  Guidry presented insurance proposals and
presentations to the Insureds in Texas and delivered the relevant policies or
cover notes there.  Although Guidry sold surplus-lines coverage to the Insureds,
he was not licensed to do so in Texas.

A.        The Insurance Policies

In 1991, Guidry obtained insurance,
effective October 1, 1991 through September 30, 1992, for the Insureds through
British-American Insurance Group Ltd. (ABritish American@).  The coverage consisted of a
commercial general liability (ACGL@) policy with a limit of $1 million for any one accident or
occurrence and an umbrella policy with a $3.5 million limit for any one
accident or occurrence.  Coverage under the 1991 British American CGL policy
was apportioned among seven insurers, and the responsibility for the coverage
limits under the umbrella policy was shared among twenty-eight insurers. 
Guidry provided the Insureds with  cover notes reflecting this coverage.

In November 1992, Guidry renewed the
coverage on the British American CGL policy.  He provided the Insureds with a
cover note showing that this coverage was divided among three insurers.  A few
weeks later, British American sent cover notes to the Agency showing excess CGL
coverage for the Insureds apportioned among eleven insurers and $5 million
in umbrella coverage provided by Ocean Marine Indemnity Company Limited.  These
policies were effective from October 1, 1992 through September 30, 1993.

In 1993 and 1994, Guidry obtained the
Insureds= CGL and umbrella insurance from
Lexington Insurance Company.  Under the terms of the Lexington policies, the
limits of coverage were reduced by the costs of defense.

B.        The Underlying Litigation








In the summer of 1994, Wirecloth
notified Guidry that it had been sued by a competitor, Derrick Manufacturing
Corporation, who alleged various patent and trademark violations, as well as
other violations of Texas common law and the Texas Business and Commerce Code. 
Guidry forwarded this information to British American.  In the summer of 1995,
the Insureds, among others, again were sued by this competitor for similar
alleged violations of a second patent.  These lawsuits (the ADerrick litigation@) were subsequently consolidated. 
The Insureds notified Guidry of the second suit, and Guidry forwarded the
information to Lexington.  Although Lexington appointed defense counsel under a
reservation of rights in April 1996, the Insureds continued to pay most of their
own defense costs.

In September 2001, Varco, L.P., a
subsidiary of National Oilwell Varco, a successor in interest to the Insureds,[2]
paid approximately $15 million to settle the Derrick litigation.  By
this time, the Insureds had incurred approximately $17 million in attorneys= fees.  Lexington paid a fraction of
the Insureds= defense costs, but did not contribute funds to settle the Derrick
litigation. 

Within a week of the settlement,
Lexington filed a declaratory judgment action against the Insureds seeking a
coverage determination (the ACoverage Suit@).  Additional insurers were later added to the suit.  The
Insureds reached a number of settlement agreements with  British American and
several other insurers.  Regarding the coverage procured through British
American, there were no settlements with the insurers securing the 1991B1992 CGL and umbrella policies, but
the Insureds settled with all of the insurers providing coverage under the 1992B1993 CGL and umbrella policies. 
Between these two extremes, the Insureds reached settlement agreements with
some, but not all, of the insurers securing the 1992B1993 excess CGL policy.  The Insureds
settled their claims against Lexington in the Coverage Suit at the same time as
they settled claims asserted against Lexington in this suit.  

C.        This
Suit








The Insureds filed the instant suit
against Guidry, the Agency, and Andrus (collectively, the ABrokers@) on August 29, 2003 (the AFiling Date@), asserting claims against the
Brokers for negligence, gross negligence, negligent misrepresentation, fraud,
breach of fiduciary duty, and violations of article 21.21 of the Texas
Insurance Code.  The Insureds also asserted claims under section 101.201 of the
Texas Insurance Code (hereinafter AUnauthorized Insurance@ claims), alleging that British
American was an Aunauthorized insurer,@ that the Brokers assisted in the
procurement of the British American policies, and that the Brokers therefore
were liable for the unpaid amount of the claims covered under the terms of the
British American policies.  In addition, the Insureds alleged that Andrus
negligently supervised Guidry, that Andrus operated the Agency as a sham to
perpetrate a fraud, and that the Agency was Andrus=s alter ego.  Finally, the Insureds
invoked the discovery rule and the doctrine of estoppel, alleging that they
first learned of the misconduct when Guidry=s deposition was taken in the
Coverage Suit.  

1.         Partial
Summary Judgment

The Brokers filed a motion for
partial summary judgment based on a limitations defense.  In their motion, the
Brokers asserted that the Insureds= claims for negligence, negligent
supervision, negligent misrepresentation, and violations of article 21.21 of
the Texas Insurance Code were barred by the two-year statute of limitations. 
In support of the motion, the Brokers attached a letter dated May 12, 1999 from
Lexington=s attorney to the Insureds= attorney, in which Lexington=s attorney stated, AUnder the terms of the Lexington
primary policies, the defense costs reduce the applicable limits of insurance.@  The Brokers also relied on a letter
from Lexington dated December 10, 2000, in which Lexington=s counsel asserted that the two-year
limitations period applied to the Insureds= claims of negligence, negligent
supervison, negligent misrepresentation, and violations of article 21.21 of the
Texas Insurance Code.  The Insureds responded and filed special exceptions on
December 8, 2004. 








The motion for partial summary
judgment was submitted without oral argument on February 7, 2005.  Less than
two weeks before the submission date, the Brokers filed a reply accompanied by
additional evidence, and less than a week later, the Insureds filed a surreply,
objections, and a motion to strike the Brokers= summary-judgment motion on the
grounds that it was set for submission after the summary-judgment hearing
deadline specified in the trial court=s docket control order.  During a
telephone conference on February 9, 2005, the trial court denied the Insureds= motion to strike, and on March 18,
2005, the trial court granted the Brokers= motion for partial summary judgment.

2.         Non-Disclosure Order

A few days before the trial court
granted partial summary judgment, Lexington filed a AMotion to Enforce Confidentiality Agreement
and for Entry of Protective Order.@ No evidentiary hearing was held, and
the trial court signed an order granting the motion on April 5, 2005
(hereinafter the ANon-Disclosure Order@).  This order barred the Insureds,
their attorneys, and additional non-parties from using or disclosing, in this
case or in any other proceeding, certain depositions and personnel files
obtained in the Coverage Suit.

3.         Trial and Judgment

About a month after entry of the
Non-Disclosure Order, the case was tried to a jury.  As a defense to the
Unauthorized Insurance Claims, the Brokers asserted that the insurance in
question had been independently procured.  Before the case was submitted to the
jury, the trial court granted the Brokers= motion for directed verdict as to
the Insureds= breach-of-fiduciary-duty claims. 

The jury returned a verdict in favor
of the Brokers as to the Insureds= claims of fraud by misrepresentation
and fraud by nondisclosure.  The jury also found that the 1991 and 1992 British
American cover notes were independently procured, and pursuant to the
instructions in the jury charge, answered no further questions regarding the
Insureds= Unauthorized Insurance Claims.  The
trial court rendered judgment on the verdict and denied the Insureds= motions for judgment notwithstanding
the verdict and for new trial. 

                                           II.  Issues Presented

The Insureds present the following
six compound issues for review.  








$                  
First, they  challenge the partial
summary judgment on the grounds that (a) the motion did not address the 1991
and 1992 placements, (b) limitations on the 1993 and 1994 placements did not
begin to run more than two years before suit was filed, and (c) the motion was
not supported by evidence that the Insureds knew or should have known about the
Brokers= violations of article 21.21 of the Insurance Code
more than two years before they filed suit.  

$                  
Second, the Insureds argue that
they raised fact issues regarding the existence of a formal or an informal
fiduciary relationship with the Brokers, and thus, the trial court erred in
granting the Brokers a directed verdict on the Insureds= claims for breach of fiduciary duty.  In a subsidiary
argument, the Insureds contend that there is a presumption that their injury
was inherently undiscoverable because a fiduciary relationship exists;
therefore, the statute of limitations was tolled.  

$                  
Third, the Insureds assert that
the trial court erred in failing to grant their motion for judgment
notwithstanding the verdict concerning their claims under the Unauthorized
Insurance Act because the evidence conclusively established that the only exception
to liability invoked by the Brokers did not apply.  

$                  
Fourth, the Insureds argue that
the trial court committed harmful error in sustaining the Brokers= hearsay objections to the Insureds= offer of two issues of Surplus Lines Reporter
& Insurance News as evidence.  

$                  
Fifth, the Insureds  assert that
the jury=s award of attorneys= fees must be reversed and the claim remanded.  

$                  
Sixth, the Insureds complain about
the Non-Disclosure Order, in which the trial court granted Lexington=s motion to enforce a confidentiality agreement that
had been reached in the Coverage Suit.[3]  The Insureds
argue that the Non-Disclosure Order is an injunction that expired upon entry of
final judgment, or alternatively, the order is void due to procedural defects. 
In addition, Lexington moved to dismiss the appeal of this issue and to
designate certain items in the record for in camera review.  Both
motions were carried with the case.

 

III.  Analysis

A.        Brokers= Motion for Partial Summary Judgment

1.         Standard of Review








In a traditional motion for summary
judgment, if the movant=s motion and summary-judgment evidence facially establish the
movant=s right to judgment as a matter of
law, the burden shifts to the nonmovant to raise a genuine, material fact issue
sufficient to defeat summary judgment.  M.D. Anderson Hosp. & Tumor
Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000). In our de novo
review of a trial court=s summary judgment, we consider all the
evidence in the light most favorable to the nonmovant, crediting evidence
favorable to the nonmovant if reasonable jurors could, and disregarding
contrary evidence unless reasonable jurors could not.  Mack Trucks, Inc. v.
Tamez, 206 S.W.3d 572, 582 (Tex. 2006).  The evidence raises a genuine issue of fact if
reasonable and fair-minded jurors could differ in their conclusions in light of
all of the summary-judgment evidence.  Goodyear Tire & Rubber Co. v.
Mayes, 236 S.W.3d 754, 755 (Tex. 2007).  

2.         Challenged
Claims








At the time the Brokers moved for
partial summary judgment, the Insureds= live pleading included claims of
negligence based on certain conduct by Guidry.[4] 
The Insureds asserted claims of negligent supervision and gross negligence
against Andrus and the Agency for the same conduct.  In addition, the Insureds
claimed that the Brokers negligently and falsely represented that they were
obtaining the best possible insurance at the lowest possible price; falsely
represented terms and conditions of the insurance they procured; and failed to
disclose material terms of the insurance coverage.  The foregoing claims were
asserted under both the common law and article 21.21 of the Texas Insurance
Code.[5]  In
particular, the Insureds alleged that the Brokers violated subsections (2),[6]
(5),[7]
and (11)[8] of section 4
of former article 21.21 of the Texas Insurance Code.  All of these claims were
included in the partial summary judgment and incorporated in the final
judgment.

3.         The
Summary-Judgment Evidence

Our first challenge in this case has
been to identify the evidence comprising the summary-judgment record.  See
Arredondo v. Rodriguez, 198 S.W.3d 236, 239 n.1 (Tex. App.CSan Antonio 2006, no pet.) (AWe will not consider evidence that
the trial court itself did not consider.@).  The Insureds assert that the
evidence attached to the Brokers= reply is not properly  part of the
summary-judgment record because it was filed without leave of court less than
21 days before the February 7, 2005 summary-judgment hearing.  The Brokers, on
the other hand, argue that the reply evidence was timely because it was filed
more than 21 days before a hearing held on March 18, 2005.  








Unfiled discovery may be used in
support of a motion for summary judgment if copies, appendices, or a notice
containing specific references to the material are filed and served on all
parties, together with a statement of intent to use such material, at least 21
days before the hearing.  Tex. R. Civ.
P. 166a(d).  It is well-established, however, that unless there is a
basis in the record to conclude that untimely material was filed with leave of
court, we presume that the trial court did not consider it.[9] 
Thus, we cannot ascertain the exact contents of the summary-judgment evidence
without first determining the date on which the motion was submitted.  Due to
the somewhat unclear record before us, this determination requires a discussion
of the record and procedural background in greater detail than otherwise would
be required. 

a.         Notice








Notice of a summary-judgment hearing
must be in writing.  See Tex. R.
Civ. P. 166a(c) (motion and any supporting affidavits Ashall be filed and served at least
twenty-one days before the time specified for hearing@) (emphasis added); Tex. R. Civ. P. 21a (methods of serving
notices required by the Texas Rules of Civil Procedure).  In the record, we
find an AAmended Notice of Oral Hearing on
Defendants= Motions for Summary Judgment@ which was filed on December 22,
2004.  The first paragraph of the Notice states that the motion is set for oral
hearing on Monday, January 31, 2005 at 1:30 p.m.  Below the attorney=s signature, however, is a
handwritten, unsigned note, Ato RESET to 2/7/05[.]@  We find no other written notice of
a hearing date for this motion in the record.  Moreover, the parties do not
dispute that the motion was submitted without oral argument on February 7, 2005.[10]

b.         Proceedings
of February 9, 2005

The trial court held a telephone
conference on February 9, 2005 during which the Brokers= motion for partial summary judgment
was discussed.  In addition, the parties and the trial court discussed the Insureds= motions to strike the Brokers= summary-judgment motion on the
grounds that the Brokers set the motion for submission after a deadline
specified in the court=s docket control order.  During this conference, the Brokers
argued that the summary-judgment motion was timely because it was originally
filed before the date reflected in the docket control order, but had been reset
to a date after the deadline.[11] 

Notably, both the parties and the
trial court acknowledged on February 9, 2005 that the motion for partial
summary judgment had been submitted and was under submission at that time. The
conversation between the parties and the trial court proceeded in pertinent
part as follows:

Court: I looked at y=all=s file, and it was very active, so I thought I would
just call you and get an agenda of what you thought was on the submission
docket for this past Monday or previous to that that you don=t think I=ve ruled on yet.








Insureds:         Very well, Your Honor.  I have a
list in front of me.

And - - and - - and [Brokers= counsel], you might want to check this off as I work
through it.  

I have the following as motions not ruled on: . . . .

. . .

Insureds:         And then we have Plaintiffs= motion to strike defendants= motions for summary judgment.

Court: Hold on.  Say that again.

Insureds:         Plaintiffs= motion to strike defendants= motions for summary judgment.  It=s basically saying they=re out of time - - out of  - - on your docket control order.

And then we have the following that was set for
February 7 - - yeah.  This past
Monday. - - Defendants= motion to strike Plaintiffs= pleadings for failure to comply with Court=s order.  Defendants= no-evidence motion for partial summary judgment as to alter ego and
sham to perpetrate a fraud.  Defendants=
traditional motion for partial summary judgment as to Plaintiffs= claims premised upon alleged misrepresentation
regarding policy provisions.  Defendants=
traditional and no-evidence motion for partial summary judgment as to Plaintiff=s claims for breach of fiduciary duty.  Defendants= traditional motion for partial summary judgment that
Plaintiffs= negligence and 21.21 claims are time-barred. . . . That is a lot, but that=s what=s set, Your
Honor.  I - - I would only point out that - - that - - that the summary
judgment motions that have been set - - all of those are the subject of
Plaintiffs= motion to strike as being set outside the time period
set forth in your docket control order entered June 26, 2004.

. . .

Court: [To counsel for the Brokers] How does that list
comport with your list?

Brokers:         I was checking them off as fast as I
could, Judge.  I - - I believe he=s right.

. . .

Court: Well, I can tell you that I=m not ready to rule on any summary judgment.  I have
been without a law clerk for a little while, and we=re just getting back up to speed.  So if those summary
judgments were set this week, do not expect a ruling this week, but as soon as
I can.

. . .








Court: Then the bases to strike the summary judgments
is you believe they=re beyond the deadline set in the original scheduling
order?

Insureds:         Yes, Your Honor.  It - - they - - I
have a scheduling order entered 6/26/2004, and it says summary judgment motions
not subject to interlocutory appeal must be set by December 20, >04.

Court: All right.

Insureds:         And - - and these were all set after
that.  Actually, some were set before and taken down on the day of argument,
and then they tried to reset them.  One of the motions dealing with limitation
has been substantially altered from when it was originally filed, but anyway,
that - - that=s your drop-dead date.

. . .

Court: Now, then, the summary judgment motion and
motion to strike the summary judgment motions.

. . .

Court: I=m
talking about a motion to strike Defendants=
motions for summary judgment, I thought.  The basis was - -

Insureds:         Untimely designation - -

Court: - - untimely - -

Insureds:         - - listed - -

Court: All right.

Insureds:         Okay.

Court: So is that true, and is that something for
which the defendants are seeking leave?

Brokers:         Judge, they were all filed - - with
the exception of one, which I=ll address
later, they were all filed before the DCO cutoff.  There was some case law that
came out on a Friday before the hearing I thought was really important, and we
asked to pass those - - that particular hearing and then have them reset.  And
then I think the other side objected.  They wanted, like, another 21 days or
something like that.  To make a long story short, they=ve been out there since, I think, November, and - -
you know, so - -[[12]]

Court: Okay. I will work up these summary
judgments, but no more.








Insureds:         Your Honor - - there=s - -there=s
one, in particular, Your Honor.  They - - they filed a sur-reply to a motion
for summary judgment that we=d already
responded to, adding a ton of new evidence that was never in their motion, and
- - and - - well, you=ll see the - - you=ll
see the responses when you see that.  But you can=t move for summary judgment on two pieces of correspondence, get a
reply, then file a sur-reply adding a ton [of] evidence that you don=t even have 21 days to respond to.

. . .

Court: So you are telling me that you filed motions
for summary judgment before the dead - - the deadline?

Brokers:         Yes, Judge.  The only one that was
filed after the deadline was the one-satisfaction rule . . . .

Court: All right.  Well, I will look at that.  I may
or may not rule on it.  All the others, I will rule on.  I can=t tell you when, but as soon as I can get up to
speed.  So that takes - - the motion to strike motion for summary judgment
is, basically, denied.

. . .

Court: I think we got through our list.

So I haven=t
signed any orders.  If anybody wants me to sign an order - - I=ve taken some notes, and it=s all on the record.  And then I=ll see y=all
at the bond hearing on February 25th, at which time, I may
be able to give you a time when I might . . . have looked at
your summary judgments because I=ve
got some new clerks starting that will help me move that paper. 

(emphasis added).  

In sum, all parties understood at the
conclusion of this conference on February 9, 2005 that the Brokers= motion for partial summary judgment
was submitted without oral argument on February 7, 2005.  The trial court
stated that it would Awork up@ the motion and rule on it.  Nevertheless, the Brokers did
not seek leave to file additional summary-judgment evidence or raise additional
grounds for summary judgment less than 21 days before the submission date.  As
the Brokers characterized these events, A[the Brokers] reset the summary
judgment hearing for February 7, 2005. . . . Twelve days before
the hearing, the [Brokers] answered the special exceptions, filed
additional evidence  which proved that the claim was time[-]barred, and
otherwise replied to [the Insureds=] response.@[13]

c.         Status
Conference of March 18, 2005








The dispute concerning the submission
dateCand thus, the timeliness of the reply
evidenceCarises from the manner in which the trial
court announced the ruling on the motion on March 18, 2005.  At a status
conference more than five weeks after the motion for partial summary judgment
was submitted, the trial court stated as follows:

I called this party today for a status conference.
. . . 

All of the motions that are pending that are based on
untimeliness for documents that have been filed over 30 days will be denied,
and those pleadings, those expert lists, et cetera, will be allowed to stand,
but this is not an opportunity to open up any other deadlines for any other
purposes.

And then the big news for todayCyou know that I have put on this
morning=s submission docket, on the Court=s motion, the motion for summary
judgment on the statute of limitations, and I have reviewed that, and I am granting
that motion.  That
goesCas to negligence, negligent
misrepresentation, negligent supervision, and Article 21.21.[[14]]

(emphasis added).  Significantly, the
trial court did not withdraw the pending summary-judgment motion from its
earlier submission.  Thus, in evaluating the statement emphasized above, we
cannot disregard the undisputedCand conflictingCfact that the motion was submitted
more than five weeks earlier and had remained continuously under submission
since that time.  Taken literally, the trial court=s verbal announcement cannot be
reconciled with the fact that the motion for partial summary judgment was
already under submission.  In addition, the trial court=s statement conflicts with the Texas
Rules of Civil Procedure requiring written notice of a summary-judgment
hearing.[15] 








The Insureds alerted the trial court
that the motion was already under submission and attempted to clarify the
identification of documents that had already been committed to the trial court=s review.  Compounding the problem,
however, the trial court=s materials at the March 18, 2005 status conference were
incomplete:

Insureds:         May I hear from you again - - I - -
I was not listening as closely as I should have. - - exactly what have you
granted the summary judgment on?

Court: I=ll
give you a copy of this order.     

Insureds:         Okay.  Your Honor, may I also ask -
-

Court: Uh-huh.

Insureds:         Did you - - in terms of all the
pleadings that were before you, did you - - did you have - - there was a motion
that was filed.  We filed a response to it.  Then there was a reply that
added a bunch of new evidence, and then we filed a reply to that objecting to
it.  

Has all that been considered?  Do we - - I just want to make sure you had complete
briefing.

Court: Now, let=s
see.  I had this.  I had this.  I had that; although, that doesn=t seem to be a file-stamped copy of that.

Insureds:         The motion - -

Court: I had - - and - - well, that=s different. . . . I have motions
for continuance going back the other way, but it=s not a response to - - in this folder, that=s all I have that speaks to that.

Insureds:         So you don=t have our reply [sic] to their motion for summary judgment.[[16]]
 All - - all - - what - - what you have is their motion for summary
judgment, no reply by us, their reply to our reply, and our sur-reply to their
reply.

Court: Okay.  And so - -                                                                    

Insureds:         So we=re - - you=re missing our response.

Court: Which was filed when?

Insureds:         It would=ve been filed . . . February 7th,
Your Honor.

Clerk:             It=s probably in that stack.

Court: Okay.  Well, hang on a
second. . . . See if [the law clerk] can find it.

Insureds:         Okay.  And - - 

Court: I=ll
certainly - - 








Special Master:         In - -

Court: Yeah.

Special Master:         - - the notebooks they
provided me, I know I=ve got it.

Court: Okay.  I=m going
to make sure.

Insureds:         And - - and Your Honor, there=s also - - we filed a document called Plaintiffs= special exceptions and response to their motion for
summary judgment.

Court: And that=s
not something you just - - I=ve seen this -
- 

Insureds:         Yeah.

Court: - - before.

Insureds:         And we would need a - - 

Court: But didn=t
they then file their reply, basically, in answer to your special exceptions?  I
mean - - and your special exceptions were, basically, AI don=t understand@?

Insureds:         Our - - our special exceptions were
- - were, basically, this: How can you, you know, say that - - for example,
part of our fraud claim is that they represented - - the Sovereign was one of
our insurers - - okay? - - which - - and we didn=t even find out the [sic] Sovereign had gone out of business - - one of
the 21.21 claims was that the Sovereign was represented to be one of our
insurers, and we didn=t even know the Sovereign had gone out of business
until - - as you know, we were into that Lexington case for years.

Court: Right.  Well, let me just say - - and I=m happy to look back at anything that I may not have
had in this blue file.  Although, that doesn=t
mean I=ve never read it; it just isn=t in this file.

And I will tell you that under Texas law, anyway, the
Supreme Court and the appellate courts have rarely found there to be situations
in which the facts are inherently undiscoverable . . . .[[17]]

I think I=ve
taken into consideration everything that you have.  The only thing that might
be a little fuzzy is what facts go to what cause of action. . . .

. . .

Insureds:         Your Honor - - I know that you have
to run, but - - but I just want to make sure that - - that I have - - 








Court: I will re - - I will relook at those things,
but I would not get my hopes up that I=m going
to change my mind.  As you know, that doesn=t
happen frequently.

Insureds:         I - - I - - and I know not to try
the Court=s patience in that regard.  Would you at least allow
us to - - to file a motion to ask you to consider a certain - - 

Court: You can always file a motion to reconsider - -
it=s always put on the submission docket.

Insureds:         Okay.  Okay.

Court: - - and I will do that.

Insureds:         Have you overruled our special
exceptions?

Court: Did you have an order?

Insureds:         No.  We had an order granting them.[[18]]
 Go ahead and - - 

Court: Okay.  I - - I have not overruled your special
exceptions because I assumed that this reply that - - again, this is not a
file-marked copy, which - - I believe somewhere in the body of the reply - -
said because of the special exceptions, we=re
filing this to clear things up for you.[[19]]

Insureds:         But - - but the problem is that
that was filed with less than 10 days [sic] before the submission date.[[20]]

Court: Right.

Insureds:         And we=re entitled to 21 days.

Court: Okay.  I bet it was more than 21 days before
March 18th.

Insureds:         It=s true but it was not 21 days before the submission date, which
is the date on which we filed our sur-reply - - 

Court: That=s -
-

Insureds:         - - to that - -

Court: You know - - 

Insureds:         - - reply.








Court: I mean, that=s -
- that=s - - that=s
great, and the fact that the Court has, on its own motion, set this - - March
18th as a hearing date, with - - which is less than 21 days - - that may
give you an appeal point.  I don=t
know.

Insureds:         Well, I=m trying the case to win it, not for appeal, Your Honor. 
But - -

Court: You know - - 

Insureds:         But - - 

Court: A win=s a
win.

Insureds:         May we - - may we - - may we - - 

Court: A win=s a
win.  If you want to do some - - you know, if you want to have a motion to
reconsider - - 

Insureds:         May we?

Court: You know, since we=re - - since we=re
going to be in trial here together for quite some time, I don=t mind - - I don=t
mind reading it.

Insureds:         Thank you.

 

(emphasis added).  Thus, the Insureds
repeatedly reminded the trial court that the summary-judgment motion was
already under submission at the time of the status conference.  Within a week,
the Insureds argued the same grounds in their Motion for Reconsideration. 

d.         Order
Granting Summary Judgment








In the meantime, the trial court
signed the order granting summary judgment.  In the order, the trial court
stated, AHaving considered the Motion and
Response and the arguments of counsel, the Court is of the opinion that the
Motion is well[-]founded and should be GRANTED.@  Notably, the trial court did not
include the Brokers= reply among the list of items considered.  And, although the
Brokers later filed an untimely motion for modification of the judgment to
indicate that the trial court considered their reply, the Brokers did not argue
that the trial court=s statements at the March 18, 2005 status conference reset
the submission date on the motion and rendered their reply timely.  Instead,
they argued that the reply was timely because the trial court denied the
Insureds= motion to strike.  This argument,
however, is without merit.  See Dixon v. E.D. Bullard Co., 138
S.W.3d 373, 376 n.2 (Tex. App.CHouston [14th Dist.] 2004, pet. granted, judgm=t vacated w.r.m.) (the denial of a
motion to strike is not the equivalent of leave to file the contested
evidence).  The trial court did not grant the motion.

e.         Motion
for Reconsideration

On April 5, 2005, the trial court
heard argument on the Insureds= motion for reconsideration and concluded:

I=m not yet
convinced to change my ruling on the negligence causes of
action. . . . And by the way, even though no one really
mentioned it, I=m not going to consider the statute of limitations
arguments that were in your reply.  I=m going to limit it to the matter of law that you raised in your
initial motion.

So I=m going to take care of
that. . . .

(emphasis added).      

Although the Insureds did not devote
any of their time at this hearing to their argument that the motion for summary
judgment was submitted on February 7, 2005 and the reply evidence therefore was
untimely, this issue was briefed in their motion for reconsideration.  Thus, we
understand the trial court=s statement as a response to the arguments presented in the
Insureds= briefing.

f.          Reply
Evidence Untimely 

Reviewing all of the foregoing, we
conclude, for several reasons, that the Brokers= motion for partial summary judgment
was submitted to the trial court on February 7, 2005, and the untimely evidence
attached to the Brokers= reply is not part of the summary-judgment record.








First, the record establishes that
the motion for summary judgment was submitted on February 7, 2005; this fact
was confirmed by the parties on February 9, 2005.  The Brokers do not contend
that the motion was ever withdrawn from submission prior to its disposition,
nor have we found any evidence in the record that this occurred.  Consequently,
the trial court=s statement purporting to simultaneously set and rule on the
motion in a single sentence cannot be given full effect.  Cf. Int=l Ins. Co. v. Herman G. West, Inc., 649 S.W.2d 824, 825B826 (Tex. App.CFort Worth 1983, no writ) (setting
aside summary judgment that was A[i]n [one]
breath . . . set and heard instanter all in one fell swoop@).  Neither the Brokers nor we have
located precedent in which a trial court, acting silently and sua sponte, has
withdrawn a pending summary-judgment motion from consideration only to surprise
the parties by spontaneously resubmitting the motion when the parties appeared
for a status conference. 

In addition, the trial court stated
at the hearing on the motion for reconsideration that it did not consider the
statute-of-limitations arguments contained in the reply.  Because the Brokers
moved for partial summary judgment on the ground that the Insureds= claims were barred by limitations,
further timely elaboration of the same grounds would have been properly
considered by the trial court.  Indeed, because the Brokers moved for partial
summary judgment solely on the ground that the Insureds= claims were barred by the two-year
statute of limitations, this was the only basis for summary judgment
that the trial court could properly consider.  See McConnell v. Southside
Indep. Sch. Dist., 858 S.W.2d 337, 339 (Tex. 1993) (plurality op.) (AThe motion for summary judgment must itself
state specific grounds on which judgment is sought. . . . The
motion for summary judgment must stand or fall on the grounds it
specifically and expressly sets forth. . . .@).  Thus, if the true submission date
were March 18, 2005, then the Brokers= reply would have been timely, and
the trial court properly could have considered the statute-of-limitations
argument contained in the reply. But if, as we conclude, the motion was
submitted on February 7, 2005, then the reply evidence offered in support of
the limitations argument was untimely, and thus, properly excluded from
consideration.  








Our conclusion that the trial court
did in fact decline to consider this evidence is consistent with the order on
the judgment, in which the trial court stated that the motion and response were
considered, but did not mention the reply.  See K-Six Television,
Inc. v. Santiago, 75 S.W.3d 91, 96 (Tex. App.CSan Antonio 2002, no pet.).  In K-Six
Television, the non-movant filed responses to separate motions for
traditional and no-evidence summary judgment, followed by an untimely amended
response to the no-evidence motion.  Id.  Upon review, the Fourth Court
of Appeals noted that, in its order on each motion, the trial court recited
that it considered the response, but did not state that it considered the
amended response.  Id.  The appellate court=s refusal to consider the amended
response accorded with the unrebutted presumption that the trial court did not
consider a response that was filed late without leave to do so.  See id. 
Here, too, the language of the order on the motion for partial summary judgment
supports the presumption that the trial court did not consider the reply evidence
that was filed late and without leave of court.[21] 
And although permission to file a late response may be reflected in a Aseparate order,@ Aa recital in the summary judgment,@ or an oral ruling contained in the
reporter=s record of the summary-judgment
hearing,[22] none of
those are present here.  On this record, we decline to hold that the
presumption that the trial court did not consider late-filed evidence has been
rebutted by the trial court=s statement that it Aput on this morning=s submission docket, on the Court=s motion, the motion for summary
judgment on the statute of limitations . . . .@[23]








4.         Brokers= Failure to Disprove Application of
Discovery Rule 

At a minimum, grounds for summary
judgment must be mentioned in the motion.  Roberts v. Sw. Tex. Methodist
Hosp., 811 S.W.2d 141, 145B46 (Tex. App.CSan Antonio 1991, writ denied).  Thus, we cannot affirm
summary judgment for reasons not expressed in the motion, even if the evidence
would support judgment on that basis.  See id. (AWhen a motion for summary judgment
asserts grounds A and B, it cannot be upheld on grounds C
and D, which were not asserted, even if the summary judgment proof
supports them and the responding party did not except to the motion.@).  

a.         Failure
to Prove Dates on Which Claims Accrued

Here, the Brokers challenged the
Insureds= claims of negligence, negligent
supervision, negligent misrepresentation, and violations of article 21.21 of
the Texas Insurance Code on the sole ground that these claims are barred by
limitations, and the trial court acknowledged that it did not consider the
limitations arguments stated in the Brokers= reply.[24] 
On this record, we conclude that the Brokers failed to conclusively establish
their right to summary judgment on these claims.








A defendant moving for summary
judgment on limitations grounds has the burden to prove the date on which the
cause of action accrued.  KPMG Peat Marwick v. Harrison County Hous. Fin.
Corp., 988 S.W.2d 746, 748 (Tex. 1999).  Generally, the determination of
this date is a question of law.  Provident Life & Accident Ins. Co. v.
Knott, 128 S.W.3d 211, 221 (Tex. 2003).  In most cases, a cause of action
accrues and the statute of limitations begins to run when a wrongful act causes
a legal injury, even if the fact of injury is not immediately discovered.  Id.;
Franco v. Slavonic Mut. Fire Ins. Ass=n, 154 S .W.3d 777, 789 (Tex. App.CHouston [14th Dist.] 2004, no pet.)
(citing  Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex.
1990)).  But, if the discovery rule applies and has been invoked by the
plaintiff, a defendant moving for summary judgment on the affirmative defense
of limitations has a Adual burden.@[25]  The defendant then must not only
conclusively prove when the cause of action accrued, but also must establish,
as a matter of law, that there is no genuine issue of material fact about when
the plaintiff discovered, or in the exercise of reasonable diligence should
have discovered, the nature of its injury.  KPMG Peat Marwick, 988
S.W.2d at 748; Burns v. Thomas, 786 S.W.2d 266, 267 (Tex. 1990).  








Here, the Brokers= motion for partial summary judgment
is directed at only half of their burden.  Although the Insureds invoked the
discovery rule in their pleadings, the Brokers did not assert in their motion
that the discovery rule is inapplicable.  Instead, the Brokers argued and
offered evidence that the Insureds knew, by May 12, 1999, that the two
Lexington primary policies were wasting policies.  As the Insureds point out, this
evidence failed to establish the date of accrual of any of their negligence
claimsCeven those arising from the Brokers= placement of the two primary
Lexington CGL policies.[26]  Likewise,
the Brokers did not argue or demonstrate that the discovery rule is
inapplicable to the Insureds= claims pursuant to article 21.21 of the Insurance Code.  See
Tex. Ins. Code Ann. art.
21.21, ' 16 (d) (Vernon Supp. 2001) (AAll actions under this
Article . . . must be commenced within two years after the
person bringing the action discovered or, in the exercise of reasonable
diligence, should have discovered the occurrence of the unfair method of competition
or unfair or deceptive act or practice.@).[27] 


b.         No
Subsequent Findings Render Error Harmless

Relying on Progressive County
Mutual Insurance Co. v. Boyd, the Brokers respond that any error in the
partial summary judgment was harmless because evidence offered at trial proved
that the Insureds= claims were time-barred.  See 177 S.W.3d 919, 921
(Tex. 2005) (per curiam) (noting that Aa trial court=s erroneous decision to grant summary
judgment can be rendered harmless by subsequent events in the trial court@).  Because this argument applies
somewhat differently to the various insurance policies, we discuss the 1991 and
1992 placements separately from the 1993 and 1994 policies.








(i)        1991
and 1992 Placements 

At the outset, we note that the facts
of Boyd, on which the Brokers rely, differ significantly from those
presented here.  In Boyd, a jury found that the insured lacked coverage
for the asserted claim; thus, the insurer had no liability on the insured=s extracontractual claims as a matter
of law, and the Boyd court held that any error in granting the summary
judgment was harmless.  Id. at 921B23.  Here, the Insureds filed suit
against their Brokers, and neither the trial court nor the jury made findings
concerning coverage under the 1991 or 1992 placements.  Thus, unlike the
circumstances presented in Boyd, there are no findings to measure
against the summary judgment to determine if error in the judgment was
harmless.

The Brokers next contend that, to
recover under article 21.21, the Insureds were required to prove that the
British American insurers failed to pay a covered claim.  According to the
Brokers, the Insureds failed to meet this burden of proof at trial.[28] 
But this argument is also unavailing.  Because the trial court granted summary
judgment as a matter of law on the Insureds= claims under this provision, these
claims were not litigated at all.  Thus, no findings were made or rulings
rendered concerning coverage under these placements. 

(a)       No
Proof of Settlement








The Brokers also argue that
contribution by the British American insurers to the settlement of the
underlying claim establishes, as a matter of law, that the British American
insurers did not fail to pay a covered claim.  Contrary to the Brokers= suggestion, however, the record does
not establish that all of the British American insurers contributed to the
settlement of the Derrick litigation, or that the Insureds settled their
coverage claims against all of the British American insurers.  Thus, even
assuming without deciding that the Insureds= claims against the Brokers arising
under article 21.21 in connection with the 1991 and 1992 placements would be
extinguished if all of the British American insurers contributed to the
settlement and the Insureds released their claims against all of these
insurers, these facts have not been established on the record.  

 

(b)       AOne Satisfaction Rule@ Argument Not Preserved

In a related argument, the Brokers
contend that the Insureds= claims against them are barred by the Aone satisfaction rule.@[29]  Under this rule, nonsettling
defendants may claim a credit based on the damages for which all tortfeasors
are jointly liable and for which the plaintiffs have already received payment. 
See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 391 (Tex. 2000).  The
Brokers argue that the Insureds= settlements with some of the insurers effectively relieved
the Brokers of liability, if any, arising from their sales to the Insureds. 
The Brokers, however, have not established the applicability of the Aone-satisfaction rule@ as a matter of law; thus, we cannot
affirm the judgment on this basis.[30]  For
example, in their settlements with Lexington Insurance Company, American
International Group, Inc., Risk Specialists Companies, Inc., Southern Risk
Specialists, Inc., Landmark Ins. Co., and American International Specialty
Lines Insurance Company in connection with policies 5535615, 5108647, 200499,
200501, and AH9900384, the Insureds expressly reserved their claims against the
Brokers.  The Insureds similarly reserved their claims against the Brokers when
settling the liability, if any, of the British American insurers under policies
92BAGL145, 92BA519, and 92BA236, effective in 1992B93.  In their briefing, however, the
Brokers make no distinction between settlement agreements that contain such
reservations and those that do not.  See Tex. R. App. P. 38.1(h); 38.2 (a).








In sum, we conclude that the trial
court=s error in granting summary judgment
concerning the 1991 and 1992 placements was not rendered harmless by subsequent
events demonstrated in the record.  We therefore reverse the portion of the
judgment concerning the Insureds= claims of negligence, negligent
supervision, negligent misrepresentation, and violation of article 21.21 of the
Insurance Code arising in connection with the 1991 and 1992 British American
placements.

(ii)      The
1993 and 1994 Placements

As previously discussed, the Brokers
asserted that the Insureds= claims for negligence, negligent misrepresentation,
negligent supervision, and violations of article 21.21 accrued on May 12,1999,
when Lexington=s attorney first notified the Insureds that defense costs reduced their
insurance limits.  The correspondence from Lexington on which the Brokers rely
only addresses coverage under Lexington=s primary policies; none of the
correspondence addresses the Lexington umbrella policies.  Thus, the Brokers
have failed to conclusively establish their right to summary judgment regarding
the umbrella policies.  Regarding the Lexington CGL policies, the Insureds
responded that limitations concerning the 1993 and 1994 placements did not
begin to run until the day Lexington denied coverage or the day the Insureds
became liable to pay a judgment or settlement in excess of policy limits,
because the mere potential exhaustion of primary policy limits before judgment
or settlement was not an injury-producing event. 








Generally, the injury-producing event
in a first-party insurance claim occurs when an insurer unreasonably fails to
pay an insured under the policy.  Murray v. San Jacinto Agency, Inc.,
800 S.W.2d 826, 829 (Tex. 1990).  The Brokers acknowledged this proposition in
their motion, arguing that Aall facts required for a cause of action existed no later
than when the Lexington policy limits were exhausted, and not when the . . .
declaratory judgment action regarding coverage was resolved at a later date.@  Nevertheless,  the Brokers= motion was not supported by evidence
establishing that the limits of the Lexington policies were exhausted more than
two years before the Insureds filed suit.[31] 


On appeal, the Brokers argue that
because the Insureds are charged with knowledge of the policies= contents, the challenged claims
against Lexington accrued on the dates in 1993 and 1994 on which the Insureds
purchased the respective policies.[32]  In support
of this argument, the Brokers rely on Mauskar v. Hardgrove.  No.
14-02-00756-CV, 2003 WL 21403464 (Tex. App.CHouston [14th Dist.] June 19, 2003,
no pet.) (mem. op.) (holding that limitations on an insured=s claims of negligent procurement,
negligent misrepresentation, and violations of the Insurance Code and Deceptive
Trade Practices Act began to run when insured purchased life insurance
coverage, and the discovery rule did not apply because the nature of the injury
was not inherently undiscoverable).  But see All-Tex Roofing, 73 S.W.3d
at 415B16 (holding that insured=s causes of action against a broker
for negligence and DTPA violations based on the broker=s actions in placing insurance with
an insolvent insurer did not accrue until the insurer should have paid a claim
but failed to do so).  








In Mauskar, it was undisputed
that the insured would have discovered the misrepresentations by reading the
policies; the summary-judgment evidence demonstrated that the insured received
written descriptions of the policies, but simply failed to read them.  Mauskar,
2003 WL 21403464, at *3.  But here, as in All-Tex, the insolvency of the
insurers was not evident from any policies, cover notes, or descriptions
received by the Insureds.  Moreover, reading the policies or the cover notes
would not reveal that Guidry was not licensed to sell surplus-lines policies in
Texas, or that better insurance was available.  Thus, the facts of this case
are readily distinguishable from those in Mauskar and more closely
resemble the facts in All-Tex. 

For the reasons discussed above, we
conclude that the trial court erred in granting partial summary judgment on the
grounds and summary-judgment evidence presented.  On this record, the Brokers
have failed to conclusively establish that the Insureds= claims of negligence, negligent
supervision, negligent misrepresentation and violations of section 21.21 of the
Texas Insurance Code are time-barred.  We therefore reverse that portion of the
final judgment incorporating the trial court=s partial summary judgment based on
limitations.

B.        Brokers= Motion for Directed Verdict on
Insureds= Claims for Breach of Fiduciary Duty

In their second issue, the Insureds
argue that the trial court erred in granting the Brokers a directed verdict on
the Insureds= claims for breach of fiduciary duty because the Insureds raised fact
issues regarding the existence of a formal or an informal fiduciary
relationship.  In a subsidiary argument, the Insureds contend that the statute
of limitations was tolled because a fiduciary relationship exists and it is
presumed that their injury was inherently undiscoverable.

1.         Standard
of Review 








Judgment without or against a jury
verdict is proper at any course of the proceedings only when the law does not
permit reasonable jurors to decide otherwise.  City of Keller v. Wilson,
168 S.W.3d 802, 823 (Tex. 2005).  Accordingly, the test for legal sufficiency
is the same for summary judgments, directed verdicts, judgments notwithstanding
the verdict, and appellate no-evidence review.  Id.  When reviewing the
legal sufficiency of the evidence, we consider the evidence in the light most
favorable to the Insureds and indulge every reasonable inference that would
support it.  See id.  We must credit favorable evidence if a reasonable
factfinder could and disregard contrary evidence unless a reasonable factfinder
could not. See id. at 827. We must determine whether the evidence at
trial would enable reasonable and fair-minded people to find the facts at
issue.  See id.  The factfinder is the only judge of witness credibility
and the weight to give to testimony. See id. at 819.

2.         Formal Fiduciary Relationship

The Insureds first argue that a
determination of whether a broker is an agent of the insured is a question of
fact.[33]  According
to the Insureds, they raised a fact issue concerning whether the Brokers had a
formal fiduciary relationship with the Insureds.  The Insureds rely on case law
in which courts note that an insurance agent Aacts for the insured in making the
application for insurance and processing the policy@[34] and on non-insurance cases
addressing the duties generally owed by an agent to his principal.[35]


Although the existence of facts
giving rise to a fiduciary duty is a question for the factfinder=s determination, the issue of whether
those facts give rise to a formal fiduciary relationship is a question of law. 
See Brewer & Pritchard, P.C. v. Johnson, 7 S.W.3d 862, 








867 (Tex. App.CHouston [1st Dist.] 1999), aff=d, 73 S.W.3d 193 (2002); Fuqua v. Taylor, 683
S.W.2d 735, 737B38 (Tex. App.CDallas 1984, writ ref=d n.r.e.). A>[N]ot every relationship involving a
high degree of trust and confidence rises to the stature of a fiduciary
relationship.=@ Meyer v. Cathey, 167 S.W.3d 327, 330 (Tex. 2005)
(quoting Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 176B77 (Tex. 1997)).  The Insureds cite
no case recognizing a formal fiduciary relationship between an insured and its
insurance broker, or the agency employing the broker, or the owner of the
agency.  In contrast, the Brokers support their argument that they did not owe
any fiduciary duties to the Insureds with Choucroun v. Sol L. Wisenberg
Insurance Agency-Life & Health Division, Inc. and the cases cited
therein.[36]

Significantly, the Insureds did not
bring forward any evidence in their case-in-chief that a fiduciary relationship
existed between the parties.  On appeal, the Insureds argue generally that A[t]he trial record speaks for itself
and contains ample evidence of Defendants= fraud, breach of fiduciary duty[,]
and statutory violations.  Plaintiffs cannot replicate herein the extensive
documents and days of testimony admitted to the jury.@  The Insureds contend that a formal
fiduciary relationship existed because the Brokers (a) Aselected and recommended insurers and
coverage@ to the Insureds, (b) Aprepared and processed@ the Insureds= applications for insurance, and
(c) procured the policies and delivered them to the Insureds in Texas.

In support of these contentions, the
Insureds primarily rely on testimony from Mary Wallace, the Insureds= employee who testified that her Amain responsibilities@ were to handle Ahuman resources/benefits,@ but that she also Awas more or less just the liaison
between Environmental Procedures and the Dwight Andrus insurance agency [and]
George Guidry[.]@  But Wallace was not Athe decision-maker regarding
insurance@ for the Insureds.  Wallace testified, AWe looked towards George Guidry as
our trusted advisor.  It was his expertise in the insurance industry.  That was
his business.  We looked for him on what we needed to do to have insurance for
our business.@  Wallace stated that Guidry Aselected the [insurance] companies[,]@ and she described the insurance
application process as follows: 








The preliminary preparation was
normally done in Andrus=s office. . . . Then it was brought to
Houston, along with the presentation, and then the balance of itCit was reviewed.  If there was [sic]
any changes to be made, any additions to be made to it, then it was changed,
and then ultimately, it was signed by . . . the secretary/treasurer of the
[appellant] corporation[s].  

After reviewing the evidence, we
conclude that reasonable and fair-minded people could not conclude that a
formal fiduciary relationship existed between the Brokers and Insureds.  See
Pickens, 836 S.W.2d at 805  (stating that an insurance agent has no duty to
procure additional coverage for a customer Amerely because the agent has
knowledge of the need for additional insurance of that customer, especially in
the absence of evidence of prior dealings where, the agent customarily has
taken care of his customer=s needs without consulting him@(emphasis added)).  A formal
fiduciary relationship is one created by law or by the nature of the contract
between the parties.  Peckham v. Johnson, 98 S.W.2d 408, 416 (Tex. Civ.
App.CFort Worth 1936), aff=d, 132 Tex. 148, 120 S.W.2d 786 (1938).  The existence
of a formal fiduciary relationship is determined by the relationship between
the parties, and if such a relationship is established, questions of whether
one party relied on or confided in the other are immaterial.  Johnson v.
Peckham, 132 Tex. 148, 151B52, 120 S.W.2d 786, 788 (1938) (addressing the formal
fiduciary relationship of partners).[37]  In this
case, however, the Insureds cite no binding precedent recognizing a formal
fiduciary relationship under similar facts, and our own research has revealed
none.  








Courts do not create fiduciary
relationships lightly.  Schlumberger Tech. Corp., 959 S.W.2d at 177. 
And as an intermediate appellate court, we decline to extend the set of formal
fiduciary relationships to encompass the relationship of an insurance agent,
agency, or broker to a client.  See T.F.W. Mgmt., Inc. v. Westwood Shores
Prop., 79 S.W.3d 713, 720 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied) (declining to create a fiduciary duty requiring the owner of a country
club to provide an accounting to a property owners= association of fees the association
provided to the club); Emscor Mfg.,Inc. v. Alliance Ins. Group, 879
S.W.2d 894, 910 (Tex. App.CHouston [14th Dist.] 1994, writ denied) (AIt is not for an intermediate
appellate court to create new causes of action.@).

3.         Informal Fiduciary Relationship

The Insureds also contend that the
trial court erred in granting a directed verdict regarding the Insureds= breach-of-fiduciary-duty claims
because the evidence raised questions of fact regarding whether an informal
fiduciary relationship existed between the parties.  When a business
transaction is involved, Athe special relationship of trust and confidence must exist
prior to, and apart from, the agreement made the basis of the suit.@  Associated Indem. Corp. v. CAT
Contracting, Inc., 964 S.W.2d 276, 288 (Tex. 1998).  After reviewing the
record under the applicable standard of review, we conclude that the evidence
would not permit reasonable and fair-minded people to conclude that a
confidential relationship existed between the Insureds and Brokers prior to the
transactions which are the subject of the Insureds= claims.

We overrule the Insureds= second issue; hence, we do not reach
their subsidiary argument that when a fiduciary relationship exists, it is
presumed that the injury caused by a breach of fiduciary duty is inherently
undiscoverable, which thereby tolls the statute of limitations.

C.        Insureds= Motion for Judgment Notwithstanding
the Verdict

1.         Standard
of Review








In their third issue, appellants
contend the trial court erred in failing to render judgment notwithstanding the
verdict (AJNOV@) on appellants= claims under the Unauthorized Insurance Act[38]
because it is undisputed that the Act applies to the 1991 and 1992 British
American placements and the evidence conclusively establishes that the Aindependent procurement@ exception does not apply as a matter
of law.[39]  Judgment
notwithstanding the verdict is proper when (a) a defect in the opponent=s pleadings makes the pleadings
insufficient to support a judgment, (b) the evidence conclusively proves a fact
that establishes a party=s right to judgment as a matter of law, or (c) the evidence
offered on a cause of action is insufficient to raise an issue of fact.  Apache
Corp. v. Dynegy Midstream Servs., Ltd., 214 S.W.3d 554, 559 (Tex.
App.CHouston [14th Dist.] 2006, pet.
granted).  In analyzing the trial court=s ruling on a JNOV motion, we
consider the evidence  in the light most favorable to the verdict, crediting
favorable evidence if reasonable jurors could, and disregarding contrary
evidence unless a reasonable juror could not.  Id. at 558B59.

2.         No
Independent Procurement

Under the Act, an insurance contract
effective in this state and entered into by an unauthorized insurer is
unenforceable by the insurer, and a person who in any manner assisted directly
or indirectly in the procurement of the contract is liable to the insured for
the full amount of a claim or loss under the terms of the contract if the
unauthorized insurer fails to pay.[40]  An
exception exists if the insurance is independently procured, which requires, inter
alia, that negotiations for the insurance occur entirely outside the State
of Texas.  Tex. Ins. Code Ann. ' 101.053(b)(4)(A).  As the party
relying on the exception, the Brokers bore the burden to prove that the
insurance at issue was independently procured.  See Risk Managers Int=l v. State, 858 S.W.2d 567, 570 (Tex. App.CAustin 1993, writ denied).  It is
undisputed that Guidry presented insurance proposals and negotiated insurance
contracts with appellants in Texas.  Thus, as a matter of law, the insurance
was not independently procured.  See id. at 570B71.[41] 









The Brokers argue that the law
regarding the independent-procurement exception was unclear at the time the
British American coverage was placed, and was not clarified until 1993, when
the Third Court of Appeals decided Risk Managers.  We disagree.  Since 1967,
the substance of the Act has provided:

Except for lawfully procured surplus
lines insurance and contracts of insurance independently procured through
negotiations occurring entirely outside of this state . . . any contract of
insurance effective in this state and entered into by an unauthorized insurer
is unenforceable by such insurer.  In the event of failure of any such
unauthorized insurer to pay any claim or loss within the provisions of such
insurance contract, any person who assisted or in any manner aided directly or
indirectly in the procurement of such insurance contract shall be liable to the
insured for the full amount thereof pursuant to the provisions of such
insurance contract.[42]

Throughout that time, the business of
insurance has been statutorily defined to include, inter alia, A[t]he issuance or delivery of
contracts of insurance to residents of this state or to persons authorized to
do business in this state,@and Adirectly or indirectly acting as an agent for or otherwise
representing or aiding on behalf of another person or insurer in the
solicitation, negotiation, procurement[,] or effectuation of insurance or
renewals thereof or in the dissemination of information as to coverage or
rates . . . .@[43]  








Amendments of the Act prior to the
publication of Risk Managers worked no substantive change applicable
here.  For example, in 1993, the language of the exception was changed from Alawfully procured surplus lines
insurance@ to Ainsurance procured by a licensed surplus lines agent from an eligible
surplus lines insurer,@ and it is undisputed that Guidry did not have a license as a
Texas surplus-lines agent at any relevant time.  Moreover, the insurance
contracts were negotiated in part in Texas and were delivered in Texas.  Thus,
under the unambiguous language of the governing statute, the insurance was not
independently procured.

Because the evidence conclusively
established that the 1991 and 1992 British American insurance policies were not
independently procured, the trial court erred in submitting Question Nine to
the jury.  See Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 56 (Tex.
1997) (A court may be entitled to decide an issue as a matter of law when there
is no conflict in the evidence . . . .@). 

3.         Result
of Trial Court Error

AAbsent some
showing of extraneous prejudice, the submission of a question of law is
harmless: if it is answered as the court should have decided, it can hardly
damage; if it is answered to the contrary, the finding would be immaterial and
hence should be ignored.@ Med. Towers, Ltd. v. St. Luke=s Episcopal Hosp., 750 S.W.2d 820,
826 (Tex. App.CHouston [14th Dist.] 1988, writ denied).  Here, Question Nine was submitted
as the predicate to Question Ten, in which the jury was asked, AWas there a failure to pay any claim
or loss arising out of the Derrick litigation that was owed to Plaintiffs
within the provision of the Cover Notes?@  The jury was asked to answer Ayes@ or Ano@ with regard to the A1991 [British American] cover notes@ and the A1992 [British American] cover notes.@  However, the instructions
accompanying Question Ten directed the jury to answer that question only if it
answered ANo@ as to the 1991 or 1992 British
American cover notes.  Because the jury answered Question Nine incorrectly, it
did not reach Question Ten.[44]








The Insureds objected at the charge
conference that there was no evidence to support the submission of Question
Nine, but they did not object to the conditioning instructions in questions
Ten, Eleven, and Twelve.  After the trial, the Insureds filed a motion for
judgment notwithstanding the verdict and a supporting brief in which they
asserted that the trial court should disregard the jury=s answer to Question Nine because, as
a matter of law, the cover notes were not independently procured.[45] 
In addition, the Insureds argued that the evidence at trial conclusively
established that at least two insurers failed to fully pay covered claims.[46] 
Finally, the Insureds asked the trial court to enter judgment against the
Brokers in the amount of $10,875,101.13 for the Insureds= actual damages; $2,098,994.00 in
attorneys= fees; conditional awards of $350,000.00 and $200,000.00 in the event of
appeals, respectively, to the intermediate court and the Texas Supreme Court;
and costs and interest.  








After reviewing the record under the
appropriate standard of review, we are not persuaded that the trial court erred
in denying the Insureds= JNOV motion.  We first note that the Insureds do not
specifically contend that they were harmed by the erroneous submission, but
instead argue that they are entitled to judgment on their Unauthorized
Insurance Act claims as a matter of law because the insurance was not
independently procured.  The Brokers respond that the Insureds did not prove
the other elements they were required to prove in order to recover (i.e.,
failure to pay a covered claim), and the Insureds reply that (a) coverage
was not contested, and (b) the Brokers= expert testified that the claims
were covered.  The record, however, demonstrates that coverage was disputed,
and because the existence of coverage is a question of law,[47]
it is not conclusively established by expert opinion testimony.  See Lubbock
County v. Strube, 953 S.W.2d 847, 857 (Tex. App.CAustin 1997, pet. denied) (stating
that expert opinion testimony is not probative of a pure question of law). 








Although the Insureds conclusively
established that the insurance was not independently procured, this indicates
only that the jury=s answer to Question Nine should be disregarded, and does not
provide a basis for judgment as a matter of law or for a new trial on the
Unauthorized Insurance Claims.  On appeal, the Insureds have provided no
argument, citations to the record or to authorities, and no analysis showing
that the trial evidence conclusively proved liability and damages as to the
Unauthorized Insurance Claims.  These elements were the subject of jury
questions which, in accordance with the conditioning instructions, the jury did
not answer.  Because the Insureds did not object to these instructions, they
have waived error arising from the jury=s failure to answer the associated
liability and damages questions.[48]  The answers
to these questions are not supplied by implication: we cannot know whether the
jury, if it had reached Question Ten, would have determined that one or more of
the insurers under the 1991 or 1992 CGL or umbrella cover notes failed to pay a
covered claim or loss.  See Carl J. Battaglia, M.D., P.A. v. Alexander,
177 S.W.3d 893, 903 (Tex. 2005).  But, by failing to object to the conditioning
instructions, the Insureds waived their right to a new trial to allow a jury to
answer these questions.[49]  We
therefore overrule the Insureds= third issue. 

D.        Exclusion
of Trade Publication

In their fourth issue, the Insureds
argue that the trial court committed reversible error by excluding as hearsay
two issues of Surplus Lines Reporter & Insurance News, an industry
trade publication.  We review a trial court=s evidentiary rulings for an abuse of
discretion.  In re J.P.B., 180 S.W.3d 570, 575 (Tex. 2005) (per
curiam).  The trial court abuses its discretion if it acts without reference to
guiding rules or principles, or in an arbitrary or unreasonable manner.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985).  To reverse a
judgment based on a claimed error in admitting or excluding evidence, a party
must show that the error probably resulted in an improper judgment.  Tex. R. App. P. 44.1(a); Interstate
Northborough P=ship v. State, 66 S.W.3d 213, 220 (Tex. 2001).  To assess whether the
excluded evidence caused such harm, we review the entire record.  Interstate
Northborough P=ship, 66 S.W.3d at 220.  We must uphold the trial court=s evidentiary ruling if there is any
legitimate basis for it.  Owens-Corning Fiberglas Corp. v. Malone, 972
S.W.2d 35, 43 (Tex. 1998).








The Insureds argue that the two
issues of the trade publication were not offered for  the truth of the matters
reported, but were nonetheless essential to prove the Insureds= fraud claims.  According to the
Insureds, the November 1992 and October 1993 issues Areport[ed] on the criminal
investigation of Dieter Hugel[50] and the
financial instability of Ocean Marine@ and were offered Ato show that the Brokers were aware
of those problems as early as November 1992, prior to their December 1992
Placement.@  The Insureds= attorney argued to the trial court, A[The publications are offered] not
for the truth of the matter stated, but [for] knowledge and the relevant time
period of that knowledge. . . . [T]his is not hearsay.  It
is an operative fact that was known to these people.@  The Insureds= attorney elaborated that the
materials were offered to Ashow knowledge and awareness by the agency.@

The trial court excluded the two
exhibits as hearsay, and explained that the Insureds seemed to be offering them
for Athe truth of what the article says,
that on such-and-such a day, it was published and that there=s something untrustworthy about this
person that=s in the article.@  The Insureds= attorney responded, ANo, Your Honor.  I=m saying that this would have been
information that would have incited inquiry to have made inquiry [sic] into
this person, for one thing, and that that was not done.@  We conclude the trial court did not
abuse its discretion in excluding the material.  








First, there is no evidence that the
Brokers read these two issues of the trade publication; thus, they are not
probative of the Brokers= knowledge as the Insureds suggest.[51] 
Moreover, although the Insureds contend that the material was not offered for
the truth of the matters asserted therein, it appears that they offered these
two issues to show that the Brokers should have known of the truth of
statements made in this material, and should have had such knowledge at the
time these issues were published.  But A[t]he hearsay rules cannot be avoided
by this kind of circular reasoning.@  Nissan Motor Co. Ltd. v.
Armstrong, 145 S.W.3d 131, 141B42 (Tex. 2004).[52] 
In fact, the Insureds do not merely contend that the Brokers should have known
of the matters alleged in the excluded evidence, but contend that, based on
information in these issues of the trade publication, the Brokers should have
concluded that Ocean Marine was financially unsound or should have conducted an
independent investigation of Hugel and Ocean Marine.  As in Nissan, the
Insureds= argument for admission rests on the
unsupported supposition that Awhere there=s smoke, there=s fire.@[53] Under these circumstances, we
conclude the trial court did not abuse its discretion in excluding this
evidence, and we overrule the Insureds= fourth issue.

E.        Attorneys= Fees

The Insureds= argument in support of their fifth
issue consists of two sentences.  First, the Insureds contend that because the
jury=s liability findings must be reversed
and remanded, the jury=s finding regarding the attorneys= fees incurred by the Insureds must
also be reversed.  Second, they assert that the jury=s finding regarding the Insureds= attorneys= fees is against the great weight and
preponderance of the evidence.  In their reply brief, the Insureds state that
this finding is not essential to the judgment but instead is advisory and 
legally irrelevant.   








Although properly submitted, the jury=s finding regarding the expenses
incurred by the Insureds to defend against the Derrick litigation,
prosecute the Lexington Coverage Suit, and in the preparation, trial, and
appeal of this case have been rendered immaterial by the jury=s answers to other questions.  See
Se. Pipe Line Co., Inc. v. Tichacek, 997 S.W.2d 166, 172 (Tex. 1999). 
Moreover, our disposition of this appeal does not affect the Brokers= liability to the Insureds under any
theory of liability submitted to the jury.  

Under these circumstances, we are not
persuaded that the finding at issue constitutes or results in reversible
error.  See Tex. R. App. P. 44.1. 
Accordingly, we overrule the Insureds= fifth issue.

F.        Non-Disclosure Order                   

The sixth and last issue concerns the
trial court=s Non-Disclosure Order granting Lexington=s AMotion to Enforce Confidentiality
Agreement.@ The Insureds argue that the trial court=s order prohibiting the Insureds and
their attorneys from using documents that Lexington considers confidential is
an injunction that expired upon entry of final judgment, or alternatively, is
void due to procedural defects.  Lexington has moved to dismiss the appeal of
this issue and to designate certain items in the record for in camera
review.

The Insureds ask this court to
declare that the trial court=s Non-Disclosure Order was dissolved upon the trial court=s rendition of final judgment and to
dismiss as moot the appeal from this order because, they argue, the order is no
longer in effect.  We conclude, however, that the Non-Disclosure Order was void
from the moment it was signed and therefore the Insureds= appeal from this order is moot.








The Insureds named Lexington as a
defendant in this case. The Insureds later settled their claims against
Lexington as well as the claims between the Insureds and Lexington in the
Coverage Suit.  To effect this settlement, Lexington and the Insureds entered
into a Rule 11 agreement and a AGeneral, Full, and Final Release of All Claims and Indemnity
Agreement@ (ASettlement Agreement@).  As part of this settlement, the
trial court signed an order dismissing Lexington from this suit at a time when
Lexington had not asserted a counterclaim or otherwise sought relief from the
court. Thereafter, the Insureds amended their petition without naming Lexington
as a defendant, thereby eliminating Lexington as a party in this case.  From
that point forward, the Insureds did not assert any claims against Lexington,
and Lexington was no longer a party in this case.  See Webb v. Jorns,
488 S.W.2d 407, 409 (Tex. 1972).  

Sometime later, Lexington, no longer
a party in the case, filed a AMotion to Enforce Confidentiality Agreement and For Entry of
Protective Order.@  In this motion, nonparty Lexington alleged that Varco
International, Inc., the parent company of the Insureds and a nonparty to this
case, had breached various agreements with Lexington, including the Settlement
Agreement, by filing several documents with the Texas Supreme Court in an
amicus brief.  To remedy this situation, nonparty Lexington asked the trial
court to enjoin nonparty Varco, as well as the Insureds and their counsel, from
further use or disclosure, in this case or in any other proceeding, of any
documents designated by Lexington as AConfidential Information.@  The trial court granted this
injunctive relief in its Non-Disclosure Order, but did not refer to the order
in its final judgment.  








If a trial court still has
jurisdiction over the parties and the case, and if one of the parties to a
settlement agreement amends its pleadings to assert a claim based on breach of
the settlement agreement, the trial court, by normal rules of pleading and
proof, can enforce the settlement agreement in the same cause number as the
case that was the subject of the settlement agreement.  See Mantas v. Fifth
Court of Appeals, 925 S.W.2d 656, 658 (Tex. 1996).  However, when Lexington
filed its motion to enforce, the Insureds already had nonsuited their claims
against Lexington, and Lexington was no longer a party.  Furthermore, the main
target of Lexington=s motion was Varco, which may have been a party to the
Settlement Agreement but was not a party to this case.  Lexington=s involvement cannot fairly be deemed
an intervention, nor can Lexington be deemed an intervenor.  The motion
Lexington filed was not a plea in intervention either in form or in substance,
and the trial court did not treat it as such.  

Because Lexington was not a party at
the time the trial court signed the Non-Disclosure Order, the trial court
lacked the power to grant the requested relief.  The Rule 11 agreement relating
to the settlement was not filed with the trial court and was not incorporated
into any judgment or decree of the trial court; thus, the claims that had been
settled were no longer a Asuit pending@ before the trial court.  See Tex. R. Civ. P. 11 (AUnless otherwise provided in these
rules, no agreement between attorneys or parties touching any suit pending will
be enforced unless it be in writing, signed and filed with the papers as part
of the record, or unless it be made in open court and entered of record.@ (emphasis added)).[54]

We conclude that the trial court=s Non-Disclosure Order was void from
the moment it was signed, and thus, the Insureds= appeal from that order and their sixth
issue are moot.   Accordingly, we dismiss the appeal of this order as moot. 
Given that we have dismissed the appeal on other grounds, we also dismiss as
moot Lexington=s motion to dismiss the Insureds= appeal from this order.  

G.        Lexington=s Motion to Designate Items for In
Camera Review








Lexington also has filed on appeal a AMotion To Designate Items for In
Camera Review@ (hereinafter AMotion to Seal@).  Lexington asks this court to
issue an order limiting inspection of certain documents contained in our
appellate record to in camera review.  Although Lexington never states
that it seeks to seal part of this court=s record, that is effectively the
relief it seeks.  Lexington does not allege, and our record does not reflect,
that the trial court sealed these documents in the trial court=s record.  On its face, Texas Rule of
Civil Procedure 76a, entitled ASealing Court Records,@ does not give appellate courts the
authority to find the necessary facts and to determine motions to seal on
appeal, and the Insureds have not cited any statute, rule, or case stating that
appellate courts have this authority.  See Tex. R. Civ. P. 76a.

Presuming, without deciding, that
this court has such authority, we conclude that Lexington has waived its right
to ask this court to seal the record as to these documents.  The record
reflects that on March 29, 2006, counsel for the Insureds filed a written
request with the clerk of the trial court, asking that the filings to which
these documents are attached be included in a supplemental clerk=s record to be filed in this court. 
The written request indicates that counsel for Lexington was informed of the
request by facsimile.  The district clerk filed an unsealed supplemental clerk=s record containing the documents in
question with this court on June 21, 2006.  Lexington did not ask this court to
seal the record until November 10, 2006, when it filed the Motion to Seal.[55] 
By then, the Insureds, Lexington, and the Brokers had filed their appellate
briefs, more than seven months had passed since the Insureds asked the district
clerk to file these unsealed court records with this court, and these unsealed
documents had been on file with this court for more than four months.  There is
no indication in the record that Lexington has ever filed a motion to seal the
trial court=s record as to these documents, and the documents continue to be
available to the public from the clerk of the trial court.  On this record, we
conclude that Lexington waived any right it may have had to obtain an order
sealing this part of the appellate record.[56]


                                                                              








IV. 
Conclusion

On this record, we hold that the
trial court erred in granting the Brokers= motion for partial summary judgment
because the Brokers failed to conclusively establish that the two-year statute
of limitations bars the Insureds= claims for negligence, negligent
supervision, negligent misrepresentation, and alleged violations of article
21.21 of the Insurance Code.  On the other hand, the trial court did not err in
granting the Brokers= motion for directed verdict as to the Insureds= claims for breach of fiduciary duty,
and the Insureds did not preserve error as to their third issue concerning the
trial court=s denial of the motion for judgment notwithstanding the verdict on their
Unauthorized Insurance Claims.  We further hold that the trial court did not
abuse its discretion by excluding from evidence two issues of a trade
publication offered by the Insureds at trial, and the jury=s findings regarding the Insureds= attorneys= fees do not present reversible
error.  Finally, we conclude that the

Insureds= appeal from the Non-Disclosure Order
is moot because the order is void, and Lexington waived any right it may have
possessed to obtain the relief sought in its Motion to Seal.  

We therefore

$                  
reverse the trial court=s judgment regarding the Insureds= claims for negligence, negligent supervision,
negligent misrepresentation, and alleged violations of article 21.21 of the
Insurance Code; 

$                  
affirm the trial court=s directed verdict in favor of the Brokers concerning
the Insureds= claims for breach of fiduciary duty; 

$                  
affirm the trial court=s denial of the Insureds= motion for judgment notwithstanding the judgment concerning the
Insureds= Unauthorized Insurance Claims; 

$                  
dismiss as moot the Insureds= appeal of the trial court=s Non-Disclosure Order;

$                  
dismiss as moot Lexington=s motion to dismiss; 

$                  
deny Lexington=s Motion to Seal; and

 








$                  
            remand this case for
further proceedings consistent with this opinion.

 

 

 

 

 

/s/        Eva M. Guzman

Justice

 

Panel
consists of Justices Frost, Seymore, and Guzman (Frost, J., concurring and
dissenting). 









[1]  See Act of May 10, 2001, 77th Leg., R.S., ch.
290, ' 1, 2001 Tex. Gen. Laws 548, 548B51, repealed and recodified by Act of May 22,
2003, 78th Leg., R.S., ch. 1674 ''
2, 26, 2003 Tex. Gen. Laws 3611, 2659B61
(current versions at Tex. Ins. Code Ann.
'' 541.051, 541.056 (Vernon 2007)). 





[2]  In 1995, Drexel Holdings bought EPI and Wirecloth,
and in April 1996, Tuboscope bought Drexel.  National Oilwell Varco later
acquired Tuboscope.  The record concerning the identities of the Insureds= successors in interest is less than clear, and we
refer to the Insureds and any such successors by the Insureds= names, as the parties have done. 





[3] Lexington moved to enforce the agreement after the
Insureds= attorneys filed an amicus brief in Lexington
Insurance Co. v. Strayhorn.  209 S.W.3d 83 (Tex. 2006).  According to
Lexington, exhibits to the amicus brief contain material that is subject to the
confidentiality agreement.





[4]  These claims were based on the allegations that
Guidry:  (a) failed to promptly notify insurers of the Derrick
litigation; (b) placed coverage with financially unsound insurers and insurers
with unsound management; (c) placed coverage with insurers that were
non-existent, corrupt, or engaged in criminal misconduct; (d) failed to
disclose knowledge of the insurers=
insolvency and corruption; (e) sold insurance to the Insureds without a Texas
license; (f) sold surplus-lines insurance without the required surplus-lines
insurance license and without complying with governing laws; (g) failed to
understand the defects in the insuring contracts and insuring entities, or sold
the policies without disclosing these defects; and (h) failed to secure better
available insurance.  





[5]  Recodified as Tex.
Ins. Code Ann. '' 541.051B162.





[6]  This subsection defines as unfair and deceptive acts
or practices in the business of insurance 

[m]aking, publishing, disseminating, circulating or
placing before the public, or causing, directly or indirectly, to be made,
published, disseminated, circulated, or placed before the public, in a
newspaper, magazine or other publication, or in the form of a notice, circular,
pamphlet, letter or poster, or over any radio or television station, or in any
other way, an advertisement, announcement or statement containing any
assertion, representation or statement with respect to the business of
insurance or with respect to any person in the conduct of his insurance
business, which is untrue, deceptive or misleading.

See Act of
May 10, 2001, 77th Leg., R.S., ch. 290, ' 1,
2001 Tex. Gen. Laws 548, 548B51 (repealed
and recodified 2003) (current version at Tex.
Ins. Code Ann. '' 541.051B.061).





[7]  This subsection defines as unfair and deceptive acts
or practices in the business of insurance 

[f]iling with any supervisory or other public
official, or making, publishing, disseminating, circulating or delivering to
any person, or placing before the public, or causing directly or indirectly, to
be made, published, disseminated, circulated, delivered to any person, or
placed before the public, any false statement of financial condition of an
insurer with intent to deceive.@  

See Act of
May 10, 2001, 77th Leg., R.S., ch. 290, ' 1,
2001 Tex. Gen. Laws 548, 548B51 (repealed
and recodified 2003) (current version at Tex.
Ins. Code Ann. '' 541.051B.061).





[8]  This subsection defines as unfair and deceptive acts
or practices in the business of insurance 

[m]isrepresenting an insurance policy by: (a) making
an untrue statement of material fact; (b) failing to state a material fact that
is necessary to make other statements made not misleading, considering the
circumstances under which the statements were made; (c) making a statement in
such manner as to mislead a reasonably prudent person to a false conclusion of
a material fact; (d) making a material misstatement of law; or (e) failing to
disclose any matter required by law to be disclosed, including a failure to
make disclosure in accordance with another provision of this code. 

See Act of
May 10, 2001, 77th Leg., R.S., ch. 290, ' 1,
2001 Tex. Gen. Laws 548, 548B51 (repealed
and recodified 2003) (current version at Tex.
Ins. Code Ann. '' 541.051B.061).





[9]    See, e.g., Benchmark Bank v. Crowder,
919 S.W.2d 657, 663 (Tex. 1996); Goswami v. Metro. Sav. & Loan Ass=n, 751
S.W.2d 487, 491 n.1 (Tex. 1988); INA of Tex. v. Bryant, 686 S.W.2d 614,
615 (Tex. 1985); Conte v. Ditta, No. 14-02-00482-CV, 2003 WL 21191296,
at *4 n.5 (Tex. App.CHouston [14th Dist.] May 22, 2003, no pet.) (mem. op.)
(presuming that trial court did not consider a late-filed affidavit where the
record showed only that the trial court considered the response).  But see
Durbin v. Culberson County, 132 S.W.3d 650, 656 (Tex. App.CEl Paso 2004, no pet.) (holding that the seven‑day
limit before submission in which a nonmovant may submit summary-judgment
evidence does not apply to the movant=s
reply); Alaniz v. Hoyt, 105 S.W.3d 330, 339B40 (Tex. App.CCorpus
Christi 2003, no pet.) (holding that affidavit filed separately from the reply
was untimely because it was offered in support of the motion for summary
judgment, but evidence attached to the reply was properly part of the
summary-judgment evidence because the evidence was offered in reply to
non-movant=s response).  Significantly, both Durbin and Alaniz
relied on Knapp v. Eppright, which we decided before Texas Rule of Civil
Procedure 166a(d) was amended to permit unfiled discovery to be used in support
of a motion for summary judgment if filed and served on all parties, together
with a statement of intent to use the specified discovery, at least 21 days
before the hearing.  783 S.W.2d 293, 296B97
(Tex. App.CHouston [14th Dist.] 1989, no writ).





[10]  The Brokers also assert in their brief, AJudge Jamison advised, however, that she did not
consider the evidence [attached to the reply] in ruling that [the Insureds=] two-year claims were time-barred.@ (emphasis added).  This statement was not accompanied
by a citation, however, and in their response to the motions for rehearing
filed in this court, the Brokers state that this is an incorrect quotation
rather than an admission that their reply evidence was not considered.  We
note, however, that until we issued our original opinion in this case, the
Brokers repeatedly expressed their understanding that the trial court declined
to consider the reply evidence.  This understanding is reflected in their
Motion to Supplement and Correct Final Judgment, in which the Brokers stated, AAt the 4/5/05 hearing on reconsideration, the Court
orally stated that it considered only the matters of law raised in the
Limitations MSJ, without considering the evidence attached to the Defendants= Reply.@ (emphasis added).  





[11]  The Insureds argued that the motion was untimely
because it was not set before the date specified in the docket control order.





[12]  The Brokers did not seek leave to file late, but
asserted that the motions themselves were timely filed.





[13]  Appellees=
Br., p. 10 (emphasis added).





[14]  We do not interpret the trial-court=s statement, Ayou
know@ as an indication that the parties had notice of a new
setting for the summary-judgment hearing.  For reasons discussed further infra,
such an interpretation would not be consistent with the record.  Rather, it is
apparent that the phrase was used as the sort of Afiller@ common in everyday, unscripted conversation.  Indeed,
as seen in further excerpts from the same hearing, quoted infra, the
trial court used the phrase Ayou know@ several times in such a manner. 





[15]  See Tex.
R. Civ. P. 21a, 166a.  Moreover, the trial court=s announcement also appears to conflict with the
Harris County District Court rule that specifies Mondays as the date on which
the submission docket is heard.  See Harris
(Tex.) Civ. Dist. Ct. Loc. R. 3.3.3 (AMotions
may be heard by written submission.  Motions shall state Monday at 8:00 a.m. as
the date for written submission.  This date shall be at least 10 days from
filing, except on leave of court.@). 
In connection with this rule, we take judicial notice of the fact that February
7, 2005 was a Monday, but March 18, 2005 was a Friday. 





[16]  Based on the recitation of the documents filed, the
Insureds appear to be referring to their response.





[17] As discussed further infra, this was not a
basis on which the Brokers moved for summary judgment.





[18]  See Harris
(Tex.) Civ. Dist. Ct. Loc. R. 3.3.1. (AMotions shall be in writing and shall be accompanied by a proposed
order granting the relief sought.@). 





[19]  In their special exceptions, the Insureds asked the
trial court to require the Brokers to refile their motion for partial summary
judgment to specifically apprise them how notice, received on May 12, 1999,
that the primary Lexington policy was a wasting policy started limitations
running with respect to the acts described in the Insureds= petition.  The Brokers= reply did not supply that connection.  Instead, the Brokers asserted
for the first time that Louisiana law applied, and the alleged acts were not
inherently undiscoverable.  In addition, the Brokers argued that the Insureds= claims accrued when the policies were purchased, or
on the dates of the Brokers= alleged
misconduct, or when the Insureds first incurred defense costs in the Derrick
litigation, or in 1995, 1996, 1998, or 1999.  These arguments were based
upon evidence and events that were not identified in the Brokers= motion for partial summary judgment.





[20]  The Brokers=
reply was filed twelve days before the submission date.





[21]  We do not give conclusive effect to the use or
non-use of commonly-employed decretal words.  Constance v. Constance,
544 S.W.2d 659, 660 (Tex. 1977). We note, however, that the trial court=s statement that it considered the motion and the
response is not Adecretal.@  See
State v. Reagan County Purchasing Co., 186 S.W.2d 128, 134 (Tex. Civ. App.CEl Paso 1944, writ ref=d w.o.m.) (explaining that Adecretal@ means the granting or denying of the remedy sought). 






[22]  Neimes v. Ta, 985 S.W.2d 132, 138B39 (Tex. App.CSan
Antonio 1998, pet. dism=d) (holding that if the record does not contain an
affirmative indication that the trial court permitted a late filing, then the
filing is a nullity).





[23]  Cf. Robinson v. State, 240 S.W.3d 919, 923
(Tex. Crim. App. 2007) (discussing record in which it could not be determined
whether the trial court denied a motion based on the merits or on a procedural
issue).  In Robinson, the trial court denied a motion filed pro se by a
party who was represented by counsel.  The Court held that the trial court
properly could have refused to consider the motion, or could have considered
the motion on its merits.  Id.  The Court further stated, AIt would obviously be better in the future if trial
courts made it clear in the record exactly which of the two options they
choose . . . .@  Id.  Because
the record was unclear, the Court remanded the case to the appellate court Aso that it may undertake to determine@ which option was exercised. 

Although we do not consider the trial
court=s orders ambiguous, we note that we would reach the
same result under that analysis.  AThe
same rules of interpretation apply in construing the meaning of a court order
or judgment as in ascertaining the meaning of other written instruments.  The
entire contents of the instrument and record should be considered. The judgment
is to be read as a whole.@  Lone Star Cement Corp. v. Fair, 467 S.W.2d
402, 404B05 (Tex. 1971); Mai v. State, 189 S.W.3d 316,
320 (Tex. App.CFort Worth 2006, pet. ref=d) (construing an ambiguous order).  In Lone Star
Cement, the Texas Supreme Court first noted that an ambiguous order could
be Aconstrued in light of the motion upon which it was
granted@ if a written motion was filed, but explained that no
written motion was available in that case.  Lone Star Cement, 467 S.W.2d
at 404.  The Court held that Athat the order
and record considered as a whole as well as the conduct of the parties and
trial court subsequent to the order dictate[d] [the] construction@ of the trial court=s
order.  Id. at 405; see also Wilde v. Murchie, 949 S.W.2d 331,
333 (Tex. 1997) (per curiam) (considering the parties= subsequent actions in construing an ambiguous
judgment).  Moreover, A[a] judgment should be construed as a whole toward the
end of harmonizing and giving effect to all the court has written.@  Point Lookout W., Inc. v. Whorton, 742 S.W.2d
277, 278 (Tex. 1987) (per curiam) (emphasis added).  





[24]  See Tex.
R. Civ. P. 166a(c) (AThe motion for
summary judgment shall state the specific grounds therefor.@); Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d
910, 912 (Tex. 1997) (AA motion for summary judgment must itself expressly
present the grounds upon which it is made, and must stand or fall on these
grounds alone.@); McConnell, 858 S.W.2d at 341 (concluding
that the trial court may not consider a brief in support of a motion for
summary judgment in determining whether summary judgment grounds and issues are
expressly presented); 1001 McKinney Ltd. v. Credit Suisse First Boston
Mortgage Capital, 192 S.W.3d 20, 25 (Tex. App.CHouston [14th Dist.] 2005, pet. denied) (stating that,
absent agreement of the parties, new grounds may not be asserted in a movant=s reply). 





[25]  David Hittner & Lynne Liberato, Summary
Judgments in Texas, 47 S. Tex. L.
Rev. 409, 480 (2006).





[26]  See Johnson & Higgins of Tex., Inc. v.
Kenneco Energy, Inc., 962 S.W.2d 507, 514 (Tex. 1998) (AA cause of action generally accrues, and the statute
of limitations begins to run, when facts come into existence that authorize a
claimant to seek a judicial remedy.@);
Moreno, 787 S.W.2d at 351 (A[A] cause of
action can generally be said to accrue when the wrongful act effects an injury.@);  All-Tex Roofing, Inc. v. Greenwood Ins. Group,
Inc., 73 S.W.3d 412 (Tex. App.CHouston
[1st Dist.] 2002, pet. denied) (in claim for negligent placement of insurance
with an insolvent insurer, claim did not accrue until insured was denied
indemnification); Gilbreath v. White, 903 S.W.2d 851, 856 (Tex. App.CTexarkana 1995, no writ) (holding that legal injury
occurred for purposes of negligence action against insurance agent when
insurance company rejected the claim).  





[27]  If late filing of the reply evidence was permitted
by the trial court, we still would conclude that the partial summary judgment
incorporated in the final judgment was overly broad.  For example, the Insureds= claims concern ten insurance policies, but the
Brokers did not produce evidence concerning the allegations of the Brokers= Afailure to
promptly notify@ any insurer other than Lexington.  On April 29, 1996,
Lexington notified the Insureds that it did not learn of Derrick I until
March 12, 1996.  But there is no indication of the date when the Insureds
should have known of any injury arising from this failure.  Cf. PAJ,
Inc. v. Hanover Ins. Co., 243 S.W.3d 630, 631 (Tex. 2008) (insured=s failure to timely notify its insurer of a claim does
not defeat coverage if the insurer was not prejudiced by the delay).  And with
regard to the six remaining policies, there is no evidence connecting the
Brokers= grounds for summary judgment with the Insureds= factual allegations.  

Another of the Insureds= negligence claims is based on allegations that the
Brokers placed coverage with financially unsound insurers and insurers with
unsound management.  But the Brokers=
offered evidence shows only that the Insureds knew of Anglo American=s insolvency by June 13, 1998.  Anglo American
underwrote 23.07% of the 1991B92 CGL policy
and 75% of the 1992B93 CGL policy.  The Brokers produced no evidence
regarding the Insureds= knowledge that any underwriters of the remaining
eight policies were financially unsound or improperly managed.





[28]  The Brokers do not contend that the Insureds= negligence claims are barred on these grounds. 





[29]  Although the Brokers filed a separate motion for
summary judgment on this basis, they do not discuss those proceedings in their
brief.  





[30]  See Stiles v. Resolution Trust Corp., 867
S.W.2d 24, 26 (Tex. 1993) (stating the general rule that a reviewing court
cannot affirm summary judgment on grounds not presented in the motion); see
also Lee R. Russ & Thomas F.
Segalla, 15 Couch on Insurance 3d ' 216:34
(2007) (indicating that settlement with an insurer does not release claims
against the insurance agency or agent if claims against them are specifically
reserved or if the claim against the insurer, which sounds in contract, is
separate from the claim against the agency).  





[31]  The two-year statute of limitations applicable to
the Insureds= negligence claims is the shortest limitations period
applicable to the case.





[32]  The Brokers did not assert this ground in their
motion for partial summary judgment.  Although the Brokers did raise this
argument in their reply, the trial court stated that it did not consider the
limitations arguments set forth in the reply brief, and the Brokers do not
assert that the trial court erred in refusing to consider these arguments.    





[33]  In support of this contention, the Insureds cite Don
Chapman Motor Sales, Inc. v. National Savings Insurance Co., 626 S.W.2d
592, 597 (Tex. App.CAustin 1981, writ ref=d n.r.e.). 





[34]  See Guthrie v. Republican Nat=l Life Ins. Co.,
682 S.W.2d 634, 637 (Tex. App.CHouston [1st
Dist.] 1984, writ ref=d n.r.e.). 





[35]  See Johnson v. Brewer & Pritchard, P.C.,
73 S.W.3d 193, 200 (Tex. 2002) (holding that an agent owes a fiduciary duty to
his principal).  





[36]  See No. 01-03-00637-CV, 2004 WL 2823147, at
*4 (Tex. App.CHouston [1st Dist.] Dec. 9, 2004, no pet.) (mem. op.)
(holding that an insurance agent Aowed
no duty to explain the terms of the insurance policy to [the insured] or to
advise him on other, alternative policy coverages@ (citing Critchfield v. Smith, 151 S.W.3d 225, 230 (Tex. App.CTyler 2004, pet. denied); Moore v. Whitney-Vaky
Ins. Agency, 966 S.W.2d 690, 692 (Tex. App.CSan Antonio 1998, no pet.); and Pickens v. Tex. Farm Bureau Ins.
Cos., 836 S.W.2d 803, 805 (Tex. App.CAmarillo
1992, no writ)).





[37]  However, evidence of trust and reliance predating
the business relationship is material in determining whether an informal
fiduciary relationship exists.





[38]  Recodified as Tex.
Ins. Code '' 101, et. seq.





[39]  We need not address all of the points on which we
differ from our concurring and dissenting colleague; a point-by-point
refutation adds nothing of value to a discussion in which it is clear that the
members of the panel disagree regarding the content and meaning of the record,
the briefs, and the caselaw. 





[40]  V.A.T.S. Insurance Code, art. 1.14-1, '' 2(b), par. 4, 3, repealed by Act of April 30,
1999, 76th Leg. R.S., ch. 101, ' 5, 1999 Tex.
Gen. Laws 486, 538, eff. Sept. 1, 1999; now codified at Tex. Ins. Code Ann. ' 101.201(a)
(Vernon Supp. 2008).  





[41]  See Act of Apr. 30, 1999, 76th Leg., R.S.,
ch. 101, ' 6, 1999 Tex. Gen. Laws 486, 538 (AThis Act is intended as a recodification only, and no
substantive change in law is intended by this Act.@); Act of May 22, 2003, 78th Leg., R.S., ch. 1274, ' 27, 2003 Tex. Gen. Laws 3611, 4139 (same).  Yorkshire
Ins. Co., Ltd. v. Seger, No. 07-05-00188-CV, BS.W.3dB, 2007 WL 1771614, at *5 (Tex. App.CAmarillo June 20, 2007, pet. denied).





[42]  V.A.T.S. Insurance Code, art. 1.14-1, '' 8, added by Act of April 27, 1967, 60th Leg.,
R.S., ch. 185, ' 1, 1967 Tex. Gen. Laws 400, 406, amended by
Act of May 27, 1993, 73rd Leg., R.S., ch. 999, ' 3, 1993 Tex. Gen. Laws 4373, 4374, repealed by Act of Apr. 30,
1999, 76th Leg., R.S., ch. 101, ' 5,
1999 Tex. Gen. Laws 486, 538, now codified at Tex.
Ins. Code Ann. ' 101.201. 





[43]  V.A.T.S. Insurance Code, art. 1.14-1, '' 2(a)(5) and (6), added by Act of April 27,
1967, 60th Leg., R.S., ch. 185, ' 1,
1967 Tex. Gen. Laws 400, 401B02. 





[44]  Question 10 was the predicate to Questions 11 and
12; thus, by answering Question 9 incorrectly, the jury failed to answer as
many as three additional jury questions.





[45]  As discussed further infra, the Insureds also
asked the trial court to disregard the jury=s
answer to Question Thirteen, which concerns the Insureds= attorneys=
fees.  But see Wagner v. Edlund, 229 S.W.3d 870,  877 (Tex. App.CDallas 2007, pet. denied) (reversing portion of JNOV
concerning attorneys= fees and stating, A>[a]
trial court may not disregard a jury=s
answer because it is against the great weight and preponderance of the
evidence.  In such a situation, the trial court may only grant a new trial@ (quoting Alm v. Aluminum Co. of Am., 717
S.W.2d 588, 594 (Tex. 1986))). 





[46]  According to the Insureds= brief in support of their motion for judgment
notwithstanding the verdict, Ocean Marine and Anglo American failed to pay the
full amount of the Insureds= losses in
connection with the litigation and settlement of the Derrick suits.  





[47]  Brown & Brown of Tex., Inc. v. Omni Metals,
Inc., BS.W.3dB, 2008 WL
746522, at *1 (Tex. App.CHouston [1st Dist.] March 20, 2008, no pet.).





[48]  See Little Rock Furniture Mfg. Co. v. Dunn,
148 Tex. 197, 203B04, 222 S.W.2d 985, 989B90 (1949) (holding party that failed to object to instruction
conditioning submission of a jury=s
question on its answer to a question waived that party=s right to have the jury make findings as to the
subsequent question), modified on other grounds by Bradford v. Arhelger,
161 Tex. 427, 340 S.W.2d 772 (1960); Tex. Employers= Ins. Ass=n v. Ray, 68 S.W.2d 290, 295
(Tex. Civ. App.CFort Worth 1933, writ ref=d) (holding appellant could not complain of jury=s failure to answer question because the charge
instructed the jury not to do so based on its answer to a prior question and
because appellant did not object to this instruction); Hunter v. Carter,
476 S.W.2d 41, 46 (Tex. Civ. App.CHouston
[14th Dist.] 1972, writ ref=d n.r.e.)
(concluding that, in case in which jury followed instructions not to answer
certain questions based on its answer to a prior question,  party waived jury
findings as to unanswered questions by not objecting to the conditional
submission of those questions); Whiteside v. Tackett, 229 S.W.2d 908,
912 (Tex. Civ. App.CAustin 1950, writ dism=d) (same as Hunter); Bankers Standard Life Ins. Co. v. Atwood,
205 S.W.2d 74, 77 (Tex. Civ. App.CAustin
1950, no writ) (same as Hunter); Spears Dairy v. Davis, 125
S.W.2d 382, 383 (Tex. Civ. App.CBeaumont 1939,
no writ) (same as Hunter and stating that party is required to object to
the conditioning instruction and to anticipate that jury may answer initial
question in such a way that it fails to answer subsequent questions that are
improperly conditioned on the jury=s
answer to the initial question).  





[49]  The Insureds rely on Spencer v. Eagle Star
Insurance Co. of America; however, Spencer is not on point because
it did not involve a conditional submission and because an objection was made
to the defect in the jury charge.  See 876 S.W.2d 154, 157 (Tex. 1994)
(holding that trial court erred in rendering take-nothing judgment
notwithstanding jury=s verdict in favor of plaintiff based on defendant=s properly preserved charge error and concluding that
proper remedy was for trial court to grant new trial based on the charge
error).





[50]  Hugel testified by videotaped deposition that he was
the founder of AGulf Coast Marine,@
which owns all of the stock in AOcean Marine.@  He further testified, AThe insurance company was Ocean Marine Indemnity Company.  The managing
general agency was Gulf Coast Marine.@ 
Ocean Marine Indemnity Company Limited was the only insurer listed on Cover
Note 92BA236, dated December 29, 1992, which provided $5 million of umbrella
coverage in policy year October 1, 1992 through September 30, 1993.  





[51]  Andrus testified that he saw a Surplus Lines
Reporter & Insurance News in November 1992, but he did not state what
issue he saw.





[52]    In Nissan, the trial court admitted a
database of complaints Nissan received regarding unintended acceleration in one
of its models.  Id. at 140.  The database did not contain evidence that
the complaints catalogued were the same as the complaints asserted by the
appellee.  Likewise, the exhibits at issue here describe complaints against
Ocean Marine and Hugel that are different from those asserted by the Insureds.





[53]    The November 1992 issue reports that Louisiana ACommissioner of Insurance Jim Brown has filed suit
against players associated with failed Alliance Casualty and Reinsurance Co.,@ alleging that the defendantsCincluding Hugel and Ocean Marine Indemnity Co., the
errors and omissions carrier for Alliance=s
holding companyCoverstated Alliance=s
assets, which allegedly caused Alliance to become insolvent.  But this article
simply repeats allegations, and even the allegations differ from those made by
the Insureds.  Moreover, the October 1993 issue was published nearly a year after
the date on which the Insureds contend the Brokers should have been aware of
Ocean Marine=s financial difficulties and Hugel=s admitted crime.  Consequently, this issue is not
probative of the Insureds= contention that the Brokers should have been aware of
Hugel=s criminal activity or Ocean Marine=s financial difficulties before the coverage was
placed in 1992.  





[54]  A nonparty may seek relief from a trial court
regarding discovery sought from the nonparty by parties in a case pending in
the trial court.  See, e.g., Tex.
R. Civ. P. 192.6.  In fact, Lexington sought, in the alternative, a
protective order under Texas Rule of Civil Procedure 192; however, Lexington
did not assert that any discovery was being sought from it in this litigation.





[55]  Lexington filed its motion to dismiss on March 7,
2006.  In this motion Lexington referred to 20 exhibits that it described as Afiled for the Court=s in
camera  inspection or alternatively under seal.@   The record does not reflect that the trial court
sealed its record as to these documents, and, in its motion to dismiss,
Lexington did not ask this court to seal its record as to these documents.





[56]  See In re R.D., 955 S.W.2d 364, 366 (Tex.
App.CSan Antonio 1997, pet. denied) (holding parties waived
any right they had to ask that appellate record be sealed).  To the extent
Lexington asserts the Insureds= alleged
violations of the Non-Disclosure Order as a basis for this motion, we already have
concluded that this order is void.